**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARK S. STEPHENSON,          )<br>             Plaintiff        )<br>                              )<br>     v.                      )<br>                              )<br>JO ANNE B. BARNHART,          )<br>Commissioner of Social Security )<br>             Defendant       ) | Civil Action No. 04-324 ERIE<br>District Judge McLaughlin<br>Magistrate Judge Baxter |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment be denied. It is further recommended that the Motion for Summary Judgment filed by the Defendant be granted and the decision of the Commissioner denying Plaintiff's application for Supplemental Social Security Income be affirmed.

**II      REPORT**

**A.      Procedural Background**

Plaintiff Mark S. Stephenson ("Stephenson") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), as amended, 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security denying his Application for Childhood Disability Benefits (CDB). Stephenson filed his CDB application on August 28, 2001, alleging a disability date of April 7, 1967, the date of his birth. His application was denied initially and a request for hearing was timely filed. A hearing was conducted before Administrative Law Judge (ALJ) James Bukes on February 11, 2003. Attorney James Bukac represented Stephenson in this matter. An independent vocational expert, William Reed, Ph.D., testified at this hearing. ALJ Bukes issued a decision on October 29, 2003, finding that Stephenson was not disabled during the relevant time period and denying his CDB application. ALJ Bukes further determined that Stephenson was not eligible for Supplemental Security

Income (SSI) payments. Stephenson filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on November 3, 2003; however, the Appeals Council denied this request on September 9, 2004.

Stephenson filed this appeal seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). He alleges errors entitling him to an award of benefits, or in the alternative, a new administrative hearing. The Commissioner disagrees. Both Stephenson and the Commissioner have filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The matter is, therefore, ripe for review and disposition.

### B. Factual Background

Stephenson was born on April 7, 1967. (R. 35, 95).[1] At the time of the ALJ hearing, Stephenson was 36 years of age. He has an eighth grade education and has not obtained a GED. He has a substantial record of arrests, placements in juvenile homes, and incarcerations for various offenses, including burglary and aggravated assault. (R. 215-216). Stephenson has past work experience as a laborer in building demolition, groundskeeper, babysitter, trash sorter for recycling, and car detailer. He also worked as a hair cutter, roofer, and farm laborer while incarcerated in Illinois. (R. 36-37). Stephenson alleges that his ability to work is limited by emotional problems, including early-onset post-traumatic stress disorder, chronic anti-social personality disorder, schizoid personality traits, and paranoid personality traits. He further alleges being limited by physical conditions, including back pain, daily occurring headaches, a popping or whistling noise in his right ear, a deviated septum, and coughing fits. (R.106).

---

[1] The Court's recitation of relevant facts is derived from the transcript of the administrative record filed by the Commissioner as part of her answer in accordance with § 205(g) of the Act, 42 U.S.C. § 405(g), which is referred to hereinafter as "R."

### C.     Medical Background

The medical evidence contained in the record reveals that Stephenson underwent several psychological and physical evaluations, which were administered by a variety of healthcare professionals.  The record does not indicate that Stephenson is regularly treated by a primary therapist.  Stephenson was first evaluated in 1974 by Allen Raven, a school psychologist, following disruptive behavior in the classroom.  Raven's psychological report noted that, intellectually, Stephenson functioned in the upper portion of the normal range of intellectual ability. (R. 331).  The report  recommended that the presence of general emotional disturbance warranted Stephenson's enrollment in a program for children who evidence behavioral disorders. (R. 331).  Raven further recommended that the Department of Children and Family Services reconsider Stephenson's foster home placement in light of his need for individualized attention. (R. 332).[2]

On September 21, 1979, at age 12, Stephenson was hospitalized at St. Mary Hospital's Psychiatric Unit.  The Pike County Illinois Sheriff's Office brought Stephenson to the hospital after he became agitated during an altercation with other adolescents who accused him of stealing a bicycle. (R. 162).  While at St. Mary Hospital, Stephenson underwent episodes of "extreme volatility" that necessitated use of physical restraints. (R. 160).  The St. Mary Hospital discharge summary diagnosed Stephenson with adjustment reaction of adolescence. (R. 160). He was discharged from St. Mary Hospital and transferred to the McFarland Zone Center on October 11, 1979. (R. 160, 168).[3]  An admission evaluation from the McFarland Center noted

---

[2]

Stephenson was removed from his "catastrophically abusive home" by the Department of Children and Family Services when he was 4 years old.  His mother reportedly chained him up and, on one occasion, nailed Stephenson's hand, with a nail gun, to the head of the family dog.  Also, Stephenson's father was reportedly committed to the Jacksonville Mental Health Center, following a violent act towards Stephenson's mother. (R. 172).

[3]

The ALJ, in his evaluation of the evidence, treats Stephenson's transfer from St. Mary Hospital to the McFarland Zone Center as two separate incidents of hospitalization rather than a transfer and continuation of the first hospitalization.  Despite the change of institutions, Stephenson remained hospitalized continuously from September 21, 1979 thru January 21, 1980.

that Stephenson's judgment was impaired in terms of socially responsible behavior. (R. 169). Stephenson was prescribed inpatient residential treatment, including twice-weekly individual therapy, socioenvironmental therapy, and activity therapy. (R. 169). At discharge, Stephenson was diagnosed with unsocialized aggressive reaction to childhood. The accompanying prognosis indicated a need for prolonged treatment. (R. 167). The McFarland Center discharged Stephenson into the care of Kaleidoscope, a private group home facility for children and adolescents, on January 21, 1980. (R. 163).

Stephenson's next series of mental health evaluations occurred 6 months after his 22nd birthday, while he was serving a 6 month prison term for assault. (R. 328, 327). These evaluations were conducted by N. Vallabhaneni, M.D., a psychiatrist, and took place between July 2, 1990 and December 24, 1990. (R. 320-328). At first, Dr. Vallabhaneni diagnosed that Stephenson had no major mental disorder; however, the diagnosis was later changed to personality disorder, most likely anti-social. (R. 328, 321). Dr. Vallabhaneni noted that there were no indications of any underlying mental illness (R. 321). Throughout this time period, Dr. Vallabhaneni prescribed Mellarill, in varying dosages, to treat Stephenson's anxiety and insomnia. (R. 320-326).

The record does not reveal any evidence of further medical treatment until April 30, 1997, when Stephenson began a series of five counseling sessions, pursuant to a directive from the Illinois Parole Board. (R. 172). Stephenson saw therapist Rod Neeson for a total of six hours of individual therapy during this period. (R. 170). Neeson's assessment report of June 4, 1997, noted that Stephenson demonstrated no signs of a psychotic disorder, had no hallucinations or delusions, and was not suicidal or homicidal. (R. 173). Neeson diagnosed Stephenson as suffering post-traumatic stress disorder, early onset, chronic; polysubstance dependence; anti-social personality disorder; schizoid personality traits; and paranoid personality traits. (R. 173). The June 4, 1997, report gave Stephenson a GAF score of 58; however, Neeson's closing summary of July 7, 1997, noted Stephenson had a GAF of 50 at

admission and a GAF of 55 at closing. (R. 171).[4]

Stephenson was next evaluated on July 25, 2001, as part of a final release evaluation carried out by the Dixon Correctional Center in Illinois. This evaluation noted that Stephenson was clinically stable, with no mood or psychotic symptoms, and was not then prescribed any psychotropic medications. (R. 175).

The record contains an assessment form signed by John T. Tomassetti, Ph.D., a state agency consultant, dated October 2, 2001. Dr. Tomassetti concluded that there was insufficient evidence available to fully document the presence of a disabling condition on or before Stephenson's 22nd birthday. (R. 177). Dr. Tomassetti gave no further comments or diagnoses. (R. 177-190).

On November 2, 2001, an employability assessment form was completed by Cheryl Tregoning, CRNP, who indicated that Stephenson was permanently disabled due to post-traumatic stress disorder and chronic back injury. (R. 316). Tregoning indicated that her assessment was based upon a physical examination of Stephenson, and a review of his medical records; however, no specific findings were noted to support her conclusion. (R. 316).

Between November 1, 2001 and May 20, 2002, Thomas D. Sneeringer, D.O., treated Stephenson for chronic coughing, GERD, asthma, and daily headaches. Dr. Sneeringer's progress notes reveal that Stephenson was prescribed several medications including: Flovent, Depakote, Zantac, and Ibuprofen. (R. 273-277). On a Medical Assistance Form, dated May 20, 2002, Dr. Sneeringer indicated that Stephenson was temporarily disabled through August 20, 2002, due to chronic obstructive pulmonary disease (COPD) and headaches, though no

---

[4] The GAF scale consists of a rating of 0-100, with 0 indicating inadequate information and 100 indicating no symptoms. The rating is divided into 10 ranges of function. A rating in the range of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals frequent shoplifting) OR any serious impairment in social, occupational, or school functioning. (e.g. no friends, unable to keep a job). A rating in the range of 51-60 indicates moderate symptoms (e.g. depressed mood and mild insomnia) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). The GAF rating is within a particular decile if *either* the symptom severity *or* the level of functioning falls within the range. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed., American Psychiatric Association 2000).

explanation for this conclusion was offered. (R. 272).

Julie Uran, Ph.D., a consultative examining psychologist, conducted a Clinical Psychological Disability Evaluation of Stephenson on January 17, 2002. (R. 214). Following her examination, Dr. Uran diagnosed Stephenson with post-traumatic stress disorder, intermittent explosive disorder, depressive disorder, bipolar disorder, learning disorder, anti-social personality disorder, and a GAF score of 50. (R. 218). Dr. Uran's report noted that Stephenson appeared unmotivated or disinterested in seeking treatment despite his emotional discomforts. (R. 218). Dr. Uran determined that Stephenson had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, and maintain attention/concentration. His ability to function independently or deal with work stresses, however, was deemed poor to none. (R. 222). His abilities to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were also deemed to be poor to none. (R. 223). Stephenson's ability to understand and carry out simple job instructions was determined to be good, while his ability to understand and carry out complex or detailed job instructions was deemed to be poor to none. (R. 222).

Shortly after seeing Dr. Uran, Stephenson underwent a disability physical examination that was conducted by Thomas Chesar, M.D., on January 18, 2002, for the Pennsylvania Bureau of Disability Determination. (R. 224-241). Dr. Chesar diagnosed Stephenson with a cough, dyspnea, recurrent headaches, GERD, and right deviated septum. (R. 226). On physical examination, Dr. Chesar noted that Stephenson coughed frequently while talking, and that pulmonary function testing revealed mild obstruction, though Stephenson performed at peak capacity (R. 226-227). Based on his examination, Dr. Chesar opined that Stephenson was able to: lift and carry 10 pounds frequently, and at least 20 pounds occasionally; stand or walk for 3 to 4 hours in an eight-hour workday; sit for an unlimited period of time; and perform unlimited pushing and pulling. (R. 228). Dr. Chesar opined further that Stephenson should never engage in activities involving bending, kneeling, stooping, crouching, balancing, or climbing, but had no environmental restrictions. (R. 229).

The record contains a psychiatric review technique form that was completed by

Sanford Golin, Ph.D., a state agency psychological consultant, on March 20, 2002. (R. 242). Based upon his review of Stephenson's available medical records, Dr. Golin opined that Stephenson's limitations were mild to moderate in degree in the activities of daily living, maintaining social function, and maintaining concentration or pace. (R. 252). Dr. Golin also completed a mental residual functional capacity assessment on March 20, 2002, in which he assessed Stephenson to be no more than moderately limited in performing functions involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 256-257).

On March 22, 2002, Jay Newberg, M.D., a state agency medical consultant, completed a physical residual functional capacity assessment form based upon his review of Stephenson's medical records. (R. 260-267). Dr. Newberg opined that Stephenson was able to: occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; stand/walk and sit for about six hours each in an eight-hour workday; perform unlimited pushing and pulling; and occasionally climb, balance, stoop, kneel, and crawl. (R. 261-262). Dr. Newberg opined further that Stephenson had no manipulative, visual, or communicative limitations, but should avoid all exposure to fumes, odors, dust, and poor ventilation. (R. 264).

Stephenson returned to Dr. Chesar for treatment of breathing problems and headaches on June 5, 2002, and continued treating with Dr. Chesar through November 6, 2002. (R. 292-300). During this period, Dr. Chesar diagnosed Stephenson with COPD, asthma, back pain, migraine headaches/muscle tension headaches, and GERD. (R. 292-295). Dr. Chesar noted that strong colognes, perfumes, and vehicle exhaust may cause Stephenson's breathing problems. (R. 295). He also provided Stephenson with an undated letter, stating that he suffers from severe COPD that may be worsened by exposure to cold air. (R. 297). Dr. Chesar gave Stephenson prescriptions for Singulair, Paxil, Prevacid, Flovent, and Altrovent, and prescribed physical therapy for back pain. (R. 293, 300). However, Stephenson attended only two physical therapy sessions, from June 26, 2002 through July 1, 2002, before stating that he was "having difficulty making it to treatments and would call to return for therapy." The therapist noted that Stephenson never called to return for treatments and, consequently, he was discharged as of

August 6, 2002, with an independent home exercise program. (R. 298).

On July 1, 2002, Dr. Chesar submitted an employability re-assessment form to the Pennsylvania Department of Public Welfare. (R. 313-314). On the assessment form, Dr. Chesar checked the box indicating that Stephenson was temporarily disabled for the period from June 5, 2002, through December 5, 2002, due to back pain, COPD, asthma, and migraine headache. (R. 314).

Upon the referral of his attorney, Stephenson underwent a psychological evaluation on February 4, 2003, that was performed by William J. Fernan, Ph.D., to determine Stephenson's level of personal adjustment. (R. 340). Dr. Fernan found that Stephenson had "very poor impulse control, easily being irritated, and yelling, screaming and throwing things." (R. 344). Nevertheless, Dr. Fernan noted that Stephenson's social and test judgments were "fairly good." (R. 344). Dr. Fernan diagnosed Stephenson with post-traumatic stress disorder, attention-deficit/hyperactivity disorder, anxiety disorder, reading and mathematics disorders, as well as anti-social personality disorder, and gave him a GAF score of 50. (R. 344-345). Dr. Fernan opined that Stephenson's prognosis was extremely poor, given the severity and long-term nature of his personal adjustment difficulties. (R. 345). He further recommended that Stephenson continue pharmacotherapy and to add other medication to improve his attention and concentration. (R. 345).[5]

### D.     Disability Hearing

During the disability hearing conducted on February 11, 2003, Stephenson testified that he lives in an apartment with his fiancee and her 10 year old daughter. (R. 35). He testified that

---

[5]

The Court notes that Stephenson has attached to his motion for summary judgment additional medical records from Dr. Fernan, dated February 6, 2003, which were not submitted to the ALJ. As a result, this Court is not required to consider such evidence in determining whether the ALJ's decision was supported by substantial evidence. See Matthews v. Apfel, 239 F.3d 589, 593-95 (3d Cir. 2001)(propriety of ALJ's decision can only be based upon evidence that was actually presented to ALJ). Furthermore, Stephenson has failed to argue to this Court that Dr. Fernan's February 2003 records constitute new or material evidence that would warrant a remand for consideration by the ALJ, which would be required before this Court could consider the findings noted therein. Matthews, 239 F.3d at 595.

he left school after the eighth grade, and has not obtained a GED. (R. 36). With regard to his past work experience, Stephenson testified that he has worked as a laborer, demolishing buildings; a groundskeeper, cutting grass and trimming hedges; a babysitter; a garbage sorter; and a car detailer. (R. 36-38). While incarcerated in Illinois, Stephenson stated that he cut hair and worked as a roofer, and, following his release from prison, he worked as a laborer for Philips construction in Paris, Illinois. (R. 36-37). He testified that he was also employed as a farm laborer, and was last employed, for an hour, by a Food Warehouse in Clarion, Pennsylvania, where he was fired and escorted from the store after physically assaulting a customer. (R. 37, 48). Stephenson testified that, during the day, he performs household chores or does cleaning and other odd jobs for his landlord. (R. 43). At the time of the hearing, Stephenson stated that he was taking the following prescription medications: Flovent, Atrovent, Singulair, Paxil, and Ibuprofen (R. 38-39).[6]

   Stephenson testified that he suffered daily headaches, which prompted him to seek out dark quiet places until the headaches passed. According to Stephenson, Paxil has helped alleviate his headaches somewhat. (R. 39-40). He testified further that he has suffered pain in his neck and lower back for approximately 15 years, and he has daily coughing spells, which he stated are brought on by cold temperatures, perfumes, and colognes (R. 41-42). He testified that he is short of breath at times, and easily winded. (R. 42-43). Stephenson admitted that he smoked, having recently cut back to five cigarettes per day. (R. 43). He also testified that he has a short temper and cannot stand to be around too many people for long periods. (R. 44). Stephenson testified that he attempted to attend psychological counseling on a regular basis, but could not, since the clinic was either booked or would not accept his Access card (R. 44).

   Following Stephenson's testimony, the ALJ called upon a vocational expert, William Reed, Ph.D., to testify (R. 50-53). The vocational expert testified that Stephenson's past work

---

[6] The court notes that Stephenson testified to having been prescribed two additional medications. The first, a prescription for his spine, is recorded as "inaudible" and not further identified in the hearing transcript. (R. 38). Stephenson could not recall the name of the second medication, which was prescribed for headaches. (R. 39).

experience had been unskilled and medium to light (R. 51). The ALJ asked the vocational expert to consider an individual of the same age, education level, and work experience as Stephenson, who: should be limited to short, simple instructions; should avoid intensive supervision and interaction with the general public; should avoid changes of the work setting; should avoid exposure to fumes, odors, dusts, gases, poor ventilation, and perfumes; was limited to a fourth grade reading level and a light capacity of work; and should occasionally engage in postural changes. (R. 51). The ALJ then asked if such an individual would be capable of performing Stephenson's past employment. The vocational expert answered that such an individual would not be capable of performing Stephenson's past work (R. 51).[7] The vocational expert then testified that there are several light, unskilled jobs available in the national economy for such an individual, such as assembler, grader and sorter, inspector, checker, or examiner. (R. 51-52).

The ALJ then asked the vocational expert whether there would be jobs available for such an individual if the individual was limited to standing or walking three to four hours in an eight hour day. (R. 52). In response, the vocational expert limited the previously mentioned jobs to sedentary positions. (R. 52). The ALJ asked if the vocational expert's testimony would change if the individual should avoid temperatures under 40 degrees. The vocational expert responded that the temperature limitation would not change his testimony. (R. 52). The ALJ then asked if the individual had no ability to deal with any amount of stress, would it affect the jobs available to him. The vocational expert testified that there would not be any work available in the national economy for that individual. (R. 52-53).

Stephenson's attorney followed up by asking the vocational expert whether an individual with the same limitations could work the jobs he identified if he was unable to function independently, or was going to be off-task and off-job for at least half a day per week secondary to a headache problem. (R. 53). The vocational expert responded that an individual having

---

[7] The court notes that the ALJ's question, to which the vocational expert is responding, is recorded as "inaudible" in the hearing transcript (R. 51).

either of the additional limitations would be unable to attain substantial gainful activity. (R. 53). Stephenson's attorney concluded by asking the vocational expert if his testimony would change if an individual, subject to the ALJ's first two limitations, was also unable to bend, kneel, stoop, crouch, balance, or climb. (R. 53-54). The vocational expert responded that this further limitation would not change his testimony with regard to the sedentary positions he previously listed. (R. 54).

### E.  The Administrative Law Judge's Decision

The ALJ made the following findings which are listed verbatim from his decision:

1. The claimant meets the non-disability requirements for Childhood Disability Benefits set forth in Section 202(d) of the Social Security Act (with the exceptions noted in 20 C.F.R. § 404.152(b)(2)).

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" base on the requirements in the Regulations 20 C.F.R. §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart Plaintiff, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. §§ 404.1527 and 416.927).

7. The claimant has the following residual functional capacity: light work with the following restrictions: only short, simple instructions; a fourth grade reading level, no intensive supervision; no work around gases, fumes, dust, or perfumes; no work with the public; and the claimant must avoid changes in the work setting.

8. The claimant is unable to perform any of his past relevant work (20 C.F.R. §§ 404.1565 and 416. 965)

9. The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. §§ 404.1563 and 416.963).

10. The claimant has "a limited education" (20 C.F.R. §§ 404.1564 and 416.964).

11. Transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 416.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an assembler, 700,000 in the national economy; grader/sorter, 85,000 in the national economy; and inspector checker, 300,000 in the national economy.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

## III. STANDARDS OF REVIEW

### A. Jurisdiction

District Court review of an ALJ's decision regarding disability benefits is limited in scope. 42 U.S.C. § 405(g) provides "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain review of such decision by a civil action." A decision of the Commissioner becomes final when the Appeals Council affirms an ALJ decision, denies review of an ALJ decision, or when a claimant fails to pursue the available administrative remedies. Aversa v. Secretary of Health & Human Services, 672 F.Supp. 775, 777 (D.N.J.1987); see also 20 C.F.R. § 404.905. This court has jurisdiction to review the case under § 405(g) because the Commissioner's decision became final upon the Appeals Council's denial of review of the ALJ's decision.

### B. Standards applicable to the ALJ's decision

The Social Security Act provides limited judicial review of a final decision of the Commissioner. In reviewing the Commissioner's decision, this Court may not decide facts anew, reweigh the evidence, or substitute this court's judgment for that of the Commissioner or, by extension, the ALJ. See Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). Rather, this Court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. 42 U.S.C. § 405(g); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)).  See also Jesurum v. Sec'y of U.S. Dep't of Health and Human Servs., 48 F.3d, 114, 117 (3d Cir. 1995);  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).  Stephenson contends that the ALJ's decision is not supported by substantial evidence.

A disability is defined under the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (Supp. 2002); 20 C.F.R. § 404.1505(a) (2002).  A claimant is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

The Commissioner must perform a five-step sequential evaluation process to make disability determinations under the regulations.  See 20 C.F.R. § 416.920.  If the claimant fails to meet the requirements at any step in the process, the Commissioner may conclude that the claimant is not disabled under the Act.  The ALJ must determine, in order: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity.  See 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, the ALJ evaluated the case under these guidelines and determined, at step five, that Stephenson could perform jobs available in the national economy. (R. 26). Specifically, the ALJ concluded that: (1) Stephenson was not currently employed in substantial gainful activity; (2) that he had impairments that were severe; (3) that these impairments did not

13

meet the criteria for listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (1999) and that Stephenson retained the capacity to perform a significant range of light work; (4) that Stephenson was unable to perform his past relevant work; and (5) that his impairments did not prevent him from performing certain jobs that are available in significant numbers in the national economy. (R. 25-26).

Stephenson has the burden of establishing that he is disabled under the Act. 20 C.F.R. §§ 404.1512, 416.912. The ALJ should consider the claimant's ability to meet certain mental and physical demands of jobs when assessing his residual functional capacity. 20 C.F.R. §§ 404.1545(a), 416.945(a).

### IV.     DISCUSSION

#### A.     ALJ's Assessment of Stephenson's Mental Residual Functional Capacity

Stephenson argues that the ALJ erred because his mental residual functional capacity assessment did not fully accommodate Dr. Uran's work-related limitations. According to Stephenson, these limitations include an inability to deal with work stress or to function independently. (See Plaintiff's Brief at p. 15). This argument is without merit.

When deciding the weight to give any medical opinion, the ALJ considers several factors, including: examining relationship; treatment relationship; the length, nature and extent of the treatment relationship; the supportability of an opinion; consistency with the record; and specialization. 20 C.F.R. §§404.1527(d) and 416.927(d). An ALJ may accord a treating physician's opinion great weight, especially when it is "based on continuing observation...over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Furthermore, opinions from a medical source regarding a claimant's residual functional capacity, and whether he meets the statutory definition of disability, are never entitled to controlling weight and must always be left to the discretion of the ALJ, based on the evidence of record. 20 C.F.R. §§ 404.1527(e)(1)-(2), 416.927(e)(1)-(2); Social Security Ruling 96-5p. The ALJ need only provide some explanation of why he has rejected evidence which suggests a contrary disposition. Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981).

14

In this case, the ALJ appropriately noted that Dr. Uran was not a treating physician, as she examined Stephenson only once. (R. 21). As a result, the ALJ appropriately gave less weight to Dr. Uran's opinion regarding Stephenson's ability to work. With regard to Dr. Fernan, the ALJ emphasized that all of the limitations imposed on the claimant by Dr. Fernan were accommodated by the residual functional capacity formulated by the ALJ, including limitations on work stress. (R. 22). However, the ALJ noted that Dr. Fernan's "overall findings are suspect to the extent that his report is based on a referral from the claimant's attorney and was clearly prepared for purposes of his applications herein; thus, it should be given much less weight than the contemporaneous findings of record, which are entirely consistent with the claimant's residual functional capacity as found herein." (R. 22-23). The Court agrees with this finding.

Dr. Neeson's 1997 assessments of Stephenson fail to indicate that Stephenson had an inability to deal with work stress or function independently (R. 170-173). Furthermore, Dr. Neeson scored Stephenson with a GAF of 58, which the ALJ properly noted was indicative of only moderate problems (R. 20, 173).[8] Similarly, Dr. Golin determined Stephenson to be only moderately limited in his ability to set realistic goals or make plans independent of others. (R. 257). Moreover, Stephenson testified at the hearing that he was able to carry groceries, perform housecleaning, and perform cleaning work and other odd jobs for his landlord, such as "vacuuming the store, or his apartment" and cleaning his car. (R. 43, 45). Thus, the record contains substantial medical evidence to support the ALJ's determination that Stephenson could perform light work.

Stephenson argues further that the ALJ failed to analyze or make specific findings with regard to the nature, frequency, or duration of his headaches. Stephenson also argues that the ALJ improperly disregarded the vocational expert's testimony that being off task for one half day per week because of headaches would preclude substantial gainful employment. (See Pl. Br.

---

[8] In his decision, the ALJ explained that he gave more weight to Dr. Neeson's opinion, than to that of Dr. Uran, since he treated Stephenson on a more regular basis (R. 21).

at 17). This argument is without merit, since the record does not contain any medical opinion stating that Stephenson's headaches would require him to be off task one half day per week. In fact, Stephenson's own testimony fails to indicate that headaches would require him to be off task for one half day per week (R. 40, 46). Thus, while the ALJ disclosed Dr. Chesar's medical findings and diagnoses with regard to Stephenson's headaches, he was not required to impose or accept a work restriction that was not supported by the record. (R. 21). As a result, the ALJ properly disregarded the vocational expert's testimony concerning the impact of such a restriction on Stephenson's work ability.

### B.     ALJ's Finding that Stephenson's Mental Conditions Did Not Meet or Equal a Listed Impairment

Stephenson asserts that the ALJ erred in determining that his mental conditions were "substantial," but did not meet or equal the requirements of the listed impairments (Pl. Br. at 18). Stephenson argues that categorizing his impairment as "substantial" is not within the criteria set forth by the Commissioners five point scale. 20 C.F.R. § 416.920a (c)(4). This argument is without merit as the ALJ appropriately determined that Stephenson's degree of impairment was severe in his findings (R. 25).

Stephenson argues that the ALJ improperly rejected the medical opinions of Dr. Chesar, Dr. Sneeringer, and nurse Tregoning, because they were in the form of checkmarks and unaccompanied by supporting rational (Pl. Br. at 18). This argument is without merit.

The opinion of a treating physician as to the nature and severity of an impairment is only entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(d) and 416.927(d). The more a medical source presents relevant evidence to support an opinion, such as laboratory findings, the more weight is given to that opinion. 20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3). Form reports that only require a physician to checkmark appropriate boxes, without further supporting evidence or explanation, are weak evidence at best. Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).

In this case, Dr. Chesar and Dr. Sneeringer indicated on a checkmark form that Stephenson was temporarily disabled as a result of COPD and headaches (R. 272, 314). Both forms indicate that the determination was reached after a review of Stephenson's records; however, this alone is not sufficient to lend weight to a medical opinion. An ALJ may discount a medical source opinion to the extent that it is not supported by diagnostic findings and explanation. (See 20 C.F.R. §§ 404.1527 (d)(3) and 416.927 (d)(3)). The ALJ chose to reject both determinations as they were unaccompanied by specific findings, as to the listed impairments, that would limit Stephenson's ability to work (R. 21). The ALJ's rejection of the opinions of Dr. Chesar and Dr. Sneeringer was appropriate.

Nurse Tregoning also used a checkmark form to diagnose that Stephenson was permanently disabled as a result of post-traumatic stress disorder and a back injury (R. 316). A registered nurse is not included in the definition of acceptable medical sources. 20 C.F.R. § 416.913(a). The ALJ cites § 416.913(a) as grounds for rejecting nurse Tregoning's opinion (R. 22). Thus, the ALJ properly declined to consider nurse Tregoning's opinion in reaching his decision.

### C.     Stephenson's Lack of Treatment For His Alleged Disability

Stephenson asserts that the ALJ drew an impermissible adverse inference from his failure to seek medical treatment for his psychological impairments. (Pl. Br. at 19). This argument is without merit.

An ALJ is permitted to find a claimant not disabled based on his refusal to follow prescribed treatment without good reason. Acceptable reasons for failing to pursue prescribed treatments include, the treatment being contrary to religious beliefs, previous treatments were unsuccessful, the treatment's magnitude makes it very risky, or the treatment involves amputation. 20 C.F.R. § 404.1530 (c); (also see Sharp v. Bowen, 705 F. Supp 1111, 1124 (W.D. Pa. 1989)).

In this case, Stephenson asserts that he suffers from disabling psychological impairments that preclude him from all work. Despite Stephenson's alleged impairments, his record reveals

17

that he has not voluntarily sought treatment of his impairments.  Rather, the only sustained treatment undertaken by Stephenson followed a parole board's orders to undergo five counseling sessions in 1997 (R. 170).  During these sessions with therapist Neeson, Stephenson stated that counseling was "a waste of time" (R. 172).  After Stephenson terminated treatment, therapist Neeson opined that Stephenson should be ordered to attend further sessions, as he declined to maintain treatment on his own behalf (R. 170).  Following a consultative examination in 2002, Dr. Uran noted that Stephenson was "unmotivated or disinterested in seeking treatment" (R. 218).  Stephenson stated at the hearing that he failed to seek further treatment because the clinic was booked, or that they would not accept his Access insurance card (R. 44).  Neither of these reasons fall within acceptable justifications for not pursuing prescribed treatment under § 404.1530 (c).  The ALJ noted Stephenson's lack of treatment and made appropriate inferences therefrom, in light of the claimed impairments (R. 20).

## V.     CONCLUSION

For the foregoing reasons, this Court concludes that the decision of the ALJ is supported by substantial evidence of record.  Accordingly, it is recommended that the Plaintiff's Motion for Summary Judgment be denied and that Defendant's Motion for Summary Judgment be granted and the decision of the Commissioner denying Plaintiff's application for Supplemental Social Security Income be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

S/Susan Paradise Baxter<br>
SUSAN PARADISE BAXTER<br>
CHIEF U.S. MAGISTRATE JUDGE

Dated: July 5, 2005

cc: The Honorable Sean J. McLaughlin
United States District Judge

all parties of record (lw)